

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2004

# Carswell v. Homestead

Precedential or Non-Precedential: Precedential

Docket No. 03-2290

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Carswell v. Homestead" (2004). *2004 Decisions.* Paper 363.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/363

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

No. 03-2290
_____

TONYA L. CARSWELL, Administratrix
of the Estate of GILBERT CARSWELL,
deceased, on behalf of the Estate of
GILBERT CARSWELL, deceased and
TONYA L. CARSWELL, Administratrix
of the Estate of GILBERT CARSWELL,
deceased on behalf of the NEXT OF KIN
of GILBERT CARSWELL, deceased,

Appellant

v.

BOROUGH OF HOMESTEAD; MARK
ZUGER, CHIEF OF POLICE OF THE
BOROUGH OF HOMESTEAD;
FRANK SNYDER

_____

APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT
OF PENNSYLVANIA
(D.C. Civ. No. 00-cv-01184 )
District Judge: Honorable Robert J.
Cindrich

_____

Argued May 11, 2004

Before: NYGAARD, McKEE, and
WEIS, Circuit Judges.

Filed : August 20, 2004
_____

Charles E. Evans, Esquire (ARGUED)
Evans, Portnoy, Quinn & O'Connor
36th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219-6401

Attorneys for Appellant

David J. MacMain, Esquire (ARGUED)
Montgomery, McCracken, Walker &
Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109-1090

Attorneys for Appellee Frank Snyder

Paul D. Krepps, Esquire (ARGUED)
Audrey J. Copeland, Esquire
Marshall, Dennehey, Warner, Coleman
and Goggin
18 Campus Blvd., Suite 250
Newtown Square, PA 19070

Attorneys for Appellees Borough of
Homestead and Police Chief Mark Zuger

_____

OPINION
_____

WEIS, Circuit Judge.

In suits under 42 U.S.C. § 1983 for damages against government officials for violation of constitutional rights, the Supreme Court recommends that the courts rule on the constitutional issue before reaching qualified immunity. In this case, after hearing all of the plaintiff's evidence at trial, the District Court assumed, but did not decide whether a constitutional violation had occurred and then granted immunity to a police officer. In the circumstances of this case, we conclude that this procedure was not reversible error and we will affirm on the merits of the immunity ruling.

Gilbert Carswell, the plaintiff's husband, was fatally shot by a Homestead Borough patrolman in the course of apprehension by the police. Plaintiff brought suit pursuant to 42 U.S.C. § 1983 alleging that her husband's death was the result of constitutional violations by Officer Frank Snyder, Police Chief Mark Zuger, and the Borough of Homestead. The District Court declined to grant qualified immunity on summary judgment, reasoning that factual disputes existed at that time. At trial, after the plaintiff had rested at the end of her case, the District Court granted judgment to the defendants as a matter of law pursuant to Fed. R. Civ. P. 50.

The tragic death of Gilbert Carswell was the culmination of months of domestic discord. After three and one-half years of marriage, plaintiff and the decedent-husband became estranged. In July 1999, some four months before the shooting occurred, the plaintiff applied to the state court for a protection from abuse order ("PFA")[1] because her husband presented "an immediate and present danger of abuse" to her and their children. Soon afterward, the Homestead Police went to

---

[1] Under the Pennsylvania Protection from Abuse Act, a plaintiff may obtain a PFA by (1) agreement with the defendant, (2) obtaining a default judgment or (3) proving the allegation of abuse by a preponderance of the evidence at a hearing. See 23 Pa. Cons. Stat. Ann. § 6107 (West 2001); 23 Pa. Cons. Stat. Ann. § 6108 (West 2004). At a minimum, a plaintiff must have a reasonable fear of bodily injury to obtain a PFA. See 23 Pa. Cons. Stat. Ann. § 6102 (West 2001). One of the typical hallmarks of a PFA is the prohibition on contact between the plaintiff and defendant. 23 Pa. Cons. Stat. Ann. § 6108(a)(6).

The statute requires the court to issue a PFA to the police department with appropriate jurisdiction to enforce the order, as well as the state police. Police officers may arrest a defendant for violating a PFA without a warrant upon probable cause, whether or not the violation occurred in their presence. 23 Pa. Cons. Stat. Ann. § 6113(a) (West 2001). A defendant who violates a PFA and is convicted of indirect criminal contempt is subject to imprisonment of up to six months. 23 Pa. Cons. Stat. Ann. § 6114 (b) (West 2001).

the family residence when the husband, despite the PFA, came to the home and punched the plaintiff.

On July 27, 1999, plaintiff applied for a second PFA, asserting that her husband had ripped the telephone from the wall, broken a table, threatened to hit her and sexually assaulted her. In early August, the police were called to the home when the husband struck the plaintiff in the face with his fist.

The plaintiff filed an indirect criminal complaint on October 10, 1999 because her husband threatened to kick her and pistol-whip her brother. One week later, the police were summoned because the husband had once again violated the PFA. In evading apprehension, he rammed a police car. As a consequence, a felony warrant was issued for his arrest.

On the evening of November 17 and the early morning hours of November 18, 1999, the husband entered the home on four separate occasions. He broke a window to gain admittance, ransacked the kitchen, and smashed the television set. On each occasion, the police came to the scene, but were unsuccessful in attempts to capture him.

After the second incident, plaintiff and a teenage girl, who was staying at the house, armed themselves with butcher knives. After the third entry, a patrolman remained in the house for an hour to provide security for the plaintiff. Moreover, the police decided that their previous shift would remain on duty together with the oncoming officers

because of concern that the husband would return.

After the fourth entry which occurred at 12:40 a.m., the police again responded, but the husband escaped. To protect plaintiff, Officer Shipley remained in the home, as he had earlier, while other officers set up a perimeter in the area.

The husband was spotted at 2:10 a.m. by a police officer who radioed the information to the law enforcement personnel in the area. Two other officers, responding to the alert, cornered the husband on the porch of a home nearby. One of the policemen drew his gun, confronted the husband, and ordered him to lie on the floor. He raised his hands in a surrender gesture, but then suddenly jumped over the porch railing and ran into the darkness.

On hearing that the husband had been sighted, Officer Shipley left the family home and joined in the pursuit. He was standing in Boone Way, a narrow alley, when he saw the husband jump from the roof of a garage on the south side of the roadway. The husband then ran in a westerly direction with Shipley in pursuit.

At this point, defendant Snyder turned his police car into Boone Way from an intersecting street west of the garage. He saw the husband some 20-30 feet away, running toward the cruiser. Snyder stopped his car somewhat diagonally across the alley and got out on the left side, leaving the door open. The headlights were on as were the lights in the cruiser's overhead bracket directed toward each side

of the alley.

Snyder then went to the right of his car about 2-3 feet behind the rear bumper. Despite orders to stop, the husband continued to run toward the police car, with hands extended in front of him at shoulder height, the palms pointed forward. Snyder could see that the husband's hands were empty when he reached the front of the patrol car.

As he took a firing position at the rear of his car, Snyder took off the safety on his gun. He fired when, according to the plaintiff's expert's testimony, the husband's chest was 24-36 inches from the gun's muzzle and the palm of his left hand was 12-24 inches away from the muzzle. The one shot that was fired entered the husband's chest in the center, struck the heart and exited on the extreme left of his back.

The Borough did not provide Snyder with a baton or pepper spray, nor were they required. The use of these non-lethal weapons was permitted, but only after an officer had successfully completed applicable familiarization programs. Snyder had not received such training and was armed only with a gun.

Plaintiff introduced portions of Snyder's discovery deposition into evidence, including a statement that he did not know that the husband was unarmed. Further, given the facts and evidence that he had at the time, Snyder believed the husband may have had a weapon on his person. Snyder also said that if he had had non-lethal weapons in his possession,

he would not have pulled his gun from the holster. He further testified that he graduated from the police academy before being hired, and had attended yearly refresher courses provided by the Commonwealth of Pennsylvania.

Plaintiff called Dr. R. P. McCauley, a criminologist, to describe proper police procedures. He stated that "knowing that the guy was unarmed, a police officer should not have drawn his weapon from the holster, but should have pushed, tackled, or tripped the fleeing suspect."

Police Chief Zuger testified that the manual for Borough officers cautioned them about the use of deadly force and the continuum that was to be followed. He also explained that there was no requirement that officers become qualified to use pepper spray or a baton. Zuger said further that Snyder had been an officer for 14 years and that there had never been a complaint against him.

After the plaintiff rested, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50. The district judge, referring to Saucier v. Katz, 533 U.S. 194 (2001), stated that in ruling on qualified immunity, he would view the facts in the light most favorable to the plaintiff. He therefore assumed that the shooting was intentional and not accidental, but that he was not required to decide whether the officer's conduct was right or wrong. Rather, the issue was whether it was clear what a reasonable officer would have done and, if that was not established, the policeman was entitled

4

to immunity. In the circumstances present, the court determined that Officer Snyder was entitled to qualified immunity and entered judgment in his favor.

The court further ruled that there was no evidence to fasten personal liability on defendant Zuger. As to him, in his official capacity, the grant of immunity to Snyder relieved Zuger as well as the Borough from liability. In addition, the trial judge found that nothing in the Constitution required a municipality, or its police department, to maintain a list of particularized type of equipment that must be furnished to its officers. The failure to provide non-lethal weapons did not rise to a constitutional level.

On appeal, plaintiff argues that the District Court erred in granting judgment for defendant Snyder because there were disputes over material facts and questions as to his credibility. Moreover, plaintiff asserts that Homestead and Chief Zuger should not have been automatically dismissed because Snyder was granted immunity. Snyder defends the District Court's ruling and asserts as an alternate basis for affirmance that the plaintiff failed to establish a violation of a constitutional right.

## I.

Fed. R. Civ. P. 50(a)(1) provides that during a jury trial, if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim . . . that cannot under the controlling law be maintained . . . without a favorable finding on that issue." In ruling on that motion, the court construes disputed issues of fact in a light most favorable to the non-movant. Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 88 (3d Cir. 2000).

## II.

Use of excessive force by a law enforcement officer is considered a "seizure" under the Fourth Amendment, which prohibits such unlawful action. Graham v. Connor, 490 U.S. 386, 395 (1989); Tennessee v. Garner, 471 U.S. 1, 7 (1985). The test is an objective one, which scrutinizes the reasonableness of the challenged conduct. The facts to be examined include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Reasonableness is to be evaluated from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

In Tennessee v. Garner, 471 U.S. at 11, the Court phrased the test as follows: "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." In Garner, a fleeing teenage

5

burglar was shot and killed by a policeman who never attempted to defend his action on any basis other than the need to prevent an escape, a justification the Court refused to accept.

Here, the District Court did not make a specific finding that the plaintiff's evidence established a constitutional violation, but pragmatically "assumed" that for purposes of the Rule 50 motion such a showing had been made. The court then moved onto the issue of whether Officer Snyder was entitled to qualified immunity.

The court was fully aware of Saucier's explanation of the difference between the determination of excessive force in the constitutional sense and the ruling on qualified immunity. Comments made by the trial judge during argument on the Rule 50 motion leave no doubt on that score. That he reviewed the evidence bearing on the Fourth Amendment issue favorably to the plaintiff was apparent.

The judge stated that "the constitutional violation requires an intentional deprivation of rights and for these purposes then we are going to assume that the shooting was intentional." Later in the colloquy he commented, ". . . I'm not sure that it wasn't [a situation] where he [the officer] was justified in using deadly force."

Our appellate review of a Rule 50 ruling is plenary and is similar to that in a summary judgment appeal. We review the record as would a District Court. This scope of appellate review places us in the same position as the District Court with respect to the admonition in Siegert v. Gilley, 500 U.S. 226 (1991) and Saucier to decide the constitutional issue before considering qualified immunity. See, e.g., Bell v. Johnson, 308 F.3d 594 (6th Cir. 2002).

It is quite understandable that the trial judge was hesitant to rule that a constitutional violation had occurred on the facts in the record at that point when the qualified immunity issue offered a more sure-footed disposition of the Rule 50 motion. Here, unlike Saucier and Siegert, the case had already been in trial for a week. Consequently, Snyder had already lost much of the benefit of qualified immunity – freedom from trial. See, e.g., Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002).

It is preferable to resolve the qualified immunity issue at the summary judgment, or earlier, stage, but if this is not possible, it remains appropriate to consider the matter in a Rule 50(a) motion. See, e.g., Ehrlich v. Town of Glastonbury, 348 F.3d 48, 49 (2d Cir. 2003); Johnson v. Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002).

The Court of Appeals in Siegert approved the grant of immunity on summary judgment, but the Supreme Court affirmed by determining that no constitutional violation had occurred. Seigert, 500 U.S. at 230-35. Saucier held that the defendant was entitled to qualified immunity, and it reversed the Court of Appeals' decision, which had denied

qualified immunity at the summary judgment stage because a material factual dispute existed. <u>Saucier</u>, 533 U.S. at 199, 209. Those procedural differences with the case before us are not dispositive, but they are factors that have some bearing.

We believe that the circumstances here, however, are sufficiently unlike those in <u>Saucier</u> and <u>Siegert</u> that we may proceed directly to the qualified immunity issue without ruling preliminarily on the constitutional violation claim. <u>See Ehrlich</u>, 348 F.3d at 55-60. We are hesitant to hold that the jury could find excessive force based on the record here.

It appears to us that without the testimony of Dr. McCauley, the plaintiff failed to establish a constitutional violation. <u>See</u> <u>Cowan</u> *ex rel.* <u>Estate of Cooper v. Breen</u>, 352 F.3d 756 (2d Cir. 2003) (expert opinion was part of plaintiff's excessive force record). We have serious doubts about the admissibility of his opinion that Snyder should not have drawn his gun based on the expert's assumption that the officer knew the husband was unarmed.

We recognize that expert opinions can be redacted from the record on appeal where they are found to be inadmissible and the court may then proceed to enter judgment based on the remaining evidence. <u>Weisgram v. Marley Co.</u>, 528 U.S. 440 (2000). In <u>Weisgram</u>, however, the admissibility of the expert testimony had been the focal point of appeal and had been thoroughly briefed and argued. In contrast here, the expert opinion issue has not been briefed on appeal. In such a setting we are most reluctant to undertake an analysis *sua sponte*. <u>See</u> <u>Garner</u>, 471 U.S. at 22 ("As for the policy of the Police Department, the absence of any discussion of this issue by the courts below, and the uncertain state of the record, preclude any consideration of its validity."). Accordingly, we assume, but do not decide, that plaintiff established a Fourth Amendment constitutional violation and proceed to the immunity issue.

III.

An officer sued for a violation of constitutional rights may be entitled to the defense of qualified immunity, that is, an exemption from trial as well as from liability for the alleged wrong. <u>Saucier</u>, 533 U.S. at 200; <u>Garner</u>, 471 U.S. 1; <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982). The formula for analyzing a qualified immunity claim is a several stage process. First, the court is to decide whether a constitutional violation has occurred, and then it must "'proceed to determine whether that right was clearly established at the time of the alleged violation.'" <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999) (quoting <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999)). A defendant "may . . . be shielded from liability for civil damages if [his] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (quoting <u>Harlow</u>, 457

U.S. at 818).

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). See also Groh v. Ramirez, ___ U.S. ___, 124 S.Ct. 1284 (2004) (explaining that whether immunity is available depends on whether the constitutional right was clearly established.); Saucier, 533 U.S. at 202 (noting that the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

Once these requirements are found to have been satisfied, the inquiry proceeds to another, closely related issue, that is, whether the officer made a reasonable mistake as to what the law requires. Saucier emphasized that the inquiry for qualified immunity eligibility is distinct from establishment of a constitutional violation of excessive force. As the Court explained, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . [i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Saucier, 533 U.S. at 205.

Qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force.'" Id. at 206. (quoting Priester v.

City of Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000)). Furthermore, "in addition to the deference officers receive on the underlying constitutional claim" in excessive force cases, "qualified immunity can apply in the event the mistaken belief was reasonable." Id. We have followed this doctrine in excessive force claims where the police shot a citizen. See, e.g., Bennett, 274 F.3d 133; Curley v. Klem, 298 F.3d 271 (3d Cir. 2002); Henry v. Perry, 866 F.2d 657 (3d Cir. 1989).

The importance of the factual background raises the question of whether the decision as to the applicability of qualified immunity is a matter for the court or jury. The Courts of Appeals are not in agreement on this point. We held in Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004), that qualified immunity is an objective question to be decided by the court as a matter of law. See also Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir. 2000). The jury, however, determines disputed historical facts material to the qualified immunity question. See Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997). District Courts may use special interrogatories to allow juries to perform this function. See, e.g., Curley, 298 F.3d at 279. The court must make the ultimate determination on the availability of qualified immunity as a matter of law. See Curley, 298 F.3d at 279; Sharrar, 128 F.3d at 828 (citing Hunter v. Bryant, 502 U.S. 224 (1991)). Several other Courts of Appeals have

8

adopted a standard similar to ours.[2] In contrast, other Courts of Appeals have held that District Courts may submit the issue of qualified immunity to the jury.[3]

All of the events leading up to the pursuit of the suspect are relevant. See Abraham v. Raso, 183 F.3d 279, 292 (3d Cir. 1999). The question is whether, in the circumstances here, it would have been clear to a reasonable officer that Snyder's conduct was unlawful in the situation he confronted. If it would not have been clear, then qualified immunity is appropriate.

If the wrongfulness of the officer's

conduct would have been clear, we must then determine whether he made a reasonable mistake. "[W]here there is 'at least some significant authority' that lends support of the police action, we have upheld qualified immunity even while deciding that the action in question violates the Constitution." Groody, 361 F.3d at 243 (internal citation omitted) (quoting Leveto v. Lapina, 258 F.3d 156, 166 (3d Cir. 2001)). See also In re City of Philadelphia Litig., 49 F.3d 945, 970 (3d Cir. 1995).

A survey of the circumstances known to Snyder is necessary to properly apply this test. After he arrived on duty as the officer in charge he had been given reports on the events at the plaintiff's home. He was aware that the husband had violated the PFA four times within the past several hours and that it was thought prudent to have an officer remain in the house to ease the fears of plaintiff, who had armed herself with a knife. Snyder was also in radio contact with the other officers who were in pursuit of the husband.

Before the shooting occurred, the husband had escaped from an armed policeman and the chase was still underway with a number of officers in pursuit. The husband was running at full speed directly toward Snyder's police cruiser. Ignoring orders to stop, the husband kept charging at the officer who held his fire until the muzzle of his gun was two feet away from the husband. Although after the shooting it was determined that the husband was unarmed,

---

[2] See, e.g., Rivera-Jimenez v. Pierluisi, 362 F.3d 87, 95 (1st Cir. 2004); Stephenson v. Doe, 332 F.3d 68, 80-81 (2d Cir. 2003); Knussman v. Maryland, 272 F.3d 625, 634 (4th Cir. 2001); Warlick v. Cross, 969 F.2d 303, 305 (7th Cir. 1992) Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002).

[3] See, e.g., McCoy v. Hernandez, 203 F.3d 371, 376 (5th Cir. 2000); Fisher v. City of Memphis, 234 F.3d 312, 317 (6th Cir. 2000); Turner v. Arkansas Ins. Dept., 297 F.3d 751, 754 (8th Cir. 2002); Ortega v. O'Connor, 146 F.3d 1149, 1155-56 (9th Cir. 1998); Maestas v. Lujan, 351 F.3d 1001, 1007-8 (10th Cir. 2003). But see Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995)(explaining that qualified immunity is ultimately a question of law and that "[t]he jury's role is limited to settling disputes as to predicate facts").

Snyder denied that he knew that at the time and there was no evidence to the contrary.

In these circumstances a reasonable officer could believe that firing at the suspect was a proper response. A reasonable officer would not be expected to take the risk of being assaulted by a fleeing man who was so close that he could grapple with him and seize the gun. Our recitation of these events is a discussion in slow motion of an incident that took place in a matter of seconds. Officer Snyder had no time for the calm, thoughtful deliberation typical of an academic setting.

The plaintiff's expert, Professor McCauley, thought that Snyder should not have pulled his gun but rather should have chosen to tackle or otherwise physically subdue the suspect. The expert's opinion did not refer to the question of mistake and consequently there is no dispute of fact. Curley, 298 F.3d at 279. In any event, this is a question of law to be decided by the court as a matter of law, Groody, 361 F.3d at 238, rather than by expert opinion. See Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995) (expert opinion not fact based but only a legal conclusion).

We conclude that at most Synder's conduct was a mistake that was reasonable under the circumstances. As Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992), said, "[w]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure."

We are not persuaded that Officer Snyder made a mistake in the use of his weapon, but even if it was an error, it was such as a reasonable officer could have made. Consequently, the District Court's entry of judgment in favor of defendant Snyder will be affirmed.

IV.

Having held that Officer Snyder was entitled to qualified immunity, the District Court determined that it was obligated to grant judgment as a matter of law in favor of the Borough and Chief Zuger. We reach the same conclusion, but do so for different reasons.

Because as a predicate to its decision on immunity, the court had assumed that Snyder had committed a constitutional violation, we must determine whether the Borough or police chief were liable for that violation. Based on our review of the record, we conclude that the plaintiff failed to present evidence from which a reasonable jury could find liability on the part of these defendants.

A municipality cannot be responsible for damages under section 1983 on a vicarious liability theory, Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694-95 (1978), and "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." City of

10

Canton v. Harris, 489 U.S. 378, 385 (1989). District Courts must review claims of municipal liability "independently of the section 1983 claims against the individual police officers." Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996); Fagan v. City of Vineland, 22 F.3d 1283, 1294 (3d Cir. 1994).

The plaintiff's municipal liability claim can be divided into two categories: (1) failure to properly train its police officers in the constitutional use of deadly force and (2) failure to equip police officers with alternatives to lethal weapons.

A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact. City of Canton, 489 U.S. at 388. This typically requires proof of a pattern of underlying constitutional violations. Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). Although it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task. See id.

In addition to proving deliberate indifference, a plaintiff must also demonstrate that the inadequate training caused a constitutional violation. See Grazier v. City of Philadelphia, 328 F.3d 120, 124-25 (3d Cir. 2003). There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2001) (quoting City of Canton,

489 U.S. at 385).

The record here fails to establish deliberate indifference or causation. Chief Zuger testified that officers attend annual in-service courses, where they study, among other subjects, relevant court opinions. Officer Snyder testified that he was present at these sessions. Zuger updated the Homestead police manual in 1997 and directed his officers to become familiar with the updated policy manual, which covered the "continuum of force."

This evidence did not establish a lack of training on the use of deadly force that amounted to a deliberate indifference, nor does it demonstrate a pattern of underlying constitutional violations that should have alerted Homestead to an inadequate training program. The record does not meet the high burden of proving deliberate indifference, nor does it show that Homestead's actions *caused* a constitutional violation. We conclude that the plaintiff failed to present evidence from which a reasonable jury could find municipal liability.

Furthermore, we have never recognized municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons. We decline to do so on the record before us. In Plakas v. Drinski, 19 F.3d 1143, 1150-51 (7th Cir. 1994), the Court of Appeals for the Seventh Circuit rejected the claim that a county had violated a suspect's constitutional rights by failing to equip its police officers with alternatives to deadly force. In holding

11

that the constitution does not mandate the types of equipment a police department must provide to its officers, the court explained:

> "We do not think it is wise policy to permit every jury in these cases to hear expert testimony that an arrestee would have been uninjured if only the police had been able to use disabling gas or a capture net or a taser (or even a larger number of police officers) and then decide that a municipality is liable because it failed to buy this equipment (or increase its police force). There can be reasonable debates about whether the Constitution also enacts a code of criminal procedure, but we think it is clear that the Constitution does not enact a police administrator's equipment list." Plakas, 19 F.3d at 1150-51 (footnote omitted).

See also Salas v. Carpenter, 980 F.2d 299, 310 (5th Cir. 1992).

The Supreme Court has not yet ruled in a case similar to Plakas, but language in the failure-to-train cases is pertinent. In City of Canton, 489 U.S. 392, we read: "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Permitting a lesser standard than deliberate indifference would "engage the federal courts in an endless exercise of second-guessing municipal employee training programs. This is an exercise we believe the federal courts are ill suited to undertake as well as one that would implicate serious questions of federalism." City of Canton, 489 U.S. at 392.

Mandating the type of equipment that police officers might find useful in the performance of their myriad duties in frequently unanticipated circumstances is a formidable task indeed. It is better assigned to municipalities than federal courts.

We conclude that the judgment as a matter of law in favor of the Borough and Chief Zuger as well as that in favor of Snyder must be affirmed.

*Estate of Carswell v. Borough of Homestead et al.*, No. 03-2290

McKee, J., concurring as to parts I, II, and III and dissenting as to part IV.

I join Parts I, II and III of the majority opinion because I agree that Officer Snyder is entitled to qualified immunity as a matter of law. I also agree that the District Court did not err analytically in assuming arguendo that a constitutional violation had occurred.[4]

---

[4] *Cf. Grabowski v. Brown*, 922 F.2d 1097, 1110 (3d Cir. 1991), *cert.*

However, I must respectfully dissent from part IV of the majority opinion because I think that, viewed in the light most favorable to plaintiff, the evidence establishes a *prima facie* case of liability against the Borough of Homestead and against Homestead Police Chief Mark Zuger in his official capacity (collectively hereafter referred to as the "Borough").[5]

## I.

This case illustrates all too clearly the daily reality in which police officers often have to make split-second, life-and-death, decisions. The doctrine of qualified immunity recognizes that reality and protects police from liability that might otherwise arise from the "sometimes hazy border between excessive and acceptable force[.]" *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks and

---

*denied sub nomine Borough of Roselle v. Brown*, 501 U.S. 1218 (1991) (finding it "illogical and contrary to the interests of judicial economy" that this court could not directly hold that "a constitutional right allegedly violated could not have been clearly established because it has not been recognized"). Further, I share the majority's skepticism regarding the admissibility of Dr. McCauley's expert testimony. *See* Maj. Op. at 15-16; *see also Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995).

[5] Because the claim against Zuger in his official capacity is tantamount to a claim against the Borough because it employs him, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991), we deal with both claims at once.

citation omitted). We evaluate whether an officer's conduct was reasonable, and thus whether the officer is entitled to qualified immunity, based upon the officer's perspective at the time he/she acted. *Graham v. Connor*, 490 U.S. 386, 396 (1989). We thereby avoid the inequities that might result from the 20/20 vision that comes with hindsight. *Id*.

Here, however, the usual concerns about judging an officer's use of force from the perspective of hindsight are not present because our analysis has the benefit of Officer Snyder's candid testimony. He testified that he saw nothing in Carswell's hands as Carswell ran toward him. App. at 1061a.[6] He was then asked, "Had you had non-lethal weapons, you would not have pulled your gun [as Carswell ran towards you], am I correct?" He responded, "Yes." *Id*. at 1064a. That testimony would allow a jury to conclude that Officer Snyder used excessive force in fatally shooting Carswell and that he did so knowingly.

As the majority ably discusses, the fact that a jury could conclude that Snyder used excessive force to subdue Carswell and thus violated Carswell's Fourth Amendment rights is not enough, standing alone, to deprive him of qualified immunity. It is, however, enough to support a finding that the use of excessive force resulted from the Borough's policy

---

[6] The officer was asked, "What you clearly saw is they were empty, the hands?" and he answered, "Yes." App. at 1061a.

and custom of providing police officers only with guns, i.e. lethal weapons.[7] The jury could conclude from Snyder's testimony that, at the very moment he fired the fatal shot, he believed that he was using excessive deadly force where non-lethal force would suffice. Indeed, if the jury accepted his testimony as true, it would have been hard to conclude anything else. The jury could therefore reason that the officer had to resort to excessive force solely because the Borough left him no alternative but to use his gun in a situation where non-lethal force could reasonably have been employed to subdue Carswell.

### A.

To establish a municipality's liability under § 1983, the plaintiff must show that plaintiff's constitutional rights were violated by the municipality's deliberate indifference as reflected in its policy or custom.[8] *See City of Canton v.*

---

[7] The qualified immunity of the police officers and the liability of the Borough are two separate and distinct issues, as the majority explains. *See* Maj. Op. at 25 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) and *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994)).

[8] "Policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Kneipp*, 95 F.3d at 1212 (internal quotation marks and citation omitted). "Customs are practices of state

*Harris*, 489 U.S. 378, 385-88 (1989). A municipality cannot, however, be held liable for the alleged constitutional deprivation unless "there is a direct causal link between a municipal policy or custom and the [] deprivation." *Id*. at 385.[9] My colleagues believe that "the record here fails to establish deliberate indifference or causation" as a matter of law. Maj. Op. at 26. However, "whether or not a defendant's conduct amounts to deliberate indifference has been described as a

---

officials . . . so permanent and well settled as to virtually constitute law." *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2001) (internal quotation marks and citation omitted). "The policy or adopted custom that subjects a municipality to § 1983 liability may relate to the training of police officers. A municipality's failure to train its police officers can subject it to liability, however, only where it reflects a deliberate or conscious choice by the municipality – a policy as defined in Supreme Court cases." *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001) (internal quotation marks, brackets and citation omitted).

[9] A municipality like the Borough "may . . . be sued directly if it is alleged to have caused a constitutional tort through a policy statement . . . officially adopted and promulgated by that body's officers." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (internal quotation marks and citation omitted). Alternatively, a plaintiff can establish a causal link between the alleged constitutional violation and a municipality's custom or practice. *Muhlenberg Township*, 269 F.3d at 214-15.

classic issue for the fact finder and a factual mainstay of actions under § 1983." *A.M. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004) (internal quotation marks, citation and brackets omitted). Given the evidence here, that should have been an issue for the jury to decide and the Borough was therefore not entitled to judgment as a matter of law under Rule 50.

In *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001), we quoted *City of Canton*, noting:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

I believe that a jury could reasonably conclude that this record establishes such deliberate indifference because the Borough's training left Officer Snyder with no reasonable alternative to the use of deadly force. The Supreme Court elaborated upon this in *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997). It explained:

> In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice – namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very

consequence that was so predictable.

*Id*. at 409-10.

We applied this teaching in *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000). There, we reviewed the District Court's grant of summary judgment in favor of the defendants in a suit alleging a violation of civil rights as a result of the plaintiff's arrest on an erroneous warrant. Plaintiff argued that the defendant county maintained a "flawed warrant creation practice and poor training procedures." *Id*. at 275 (internal quotation marks omitted). Warrants were generated "based on a single datum – the criminal complaint number . . . [with] no other information [and] no check . . . to guard against the kind of mistake [that was] made. Nor [were] there procedures that would allow [an] officer . . . who suspects an error to confirm that suspicion." *Id*. We concluded that the "failure to provide protective measures and failsafes . . . seems comparable to 'a failure to equip law enforcement officers with specific tools to handle recurring situations'" and reversed the grant of summary judgment for the municipality. *Id*. at 277.

**B.**

An even more compelling *prima facie* case of municipal liability under § 1983 was established here than in *Berg*. Police Chief Zuger compiled the policy manual for the Borough's police department pursuant to his authority as police chief. App. at 984a. The manual contains the Borough's official policy for the police department, and all police officers in the Borough were required to familiarize themselves with it and attest to having read it. It prescribes an official policy of "progressive force" for the Borough's police, stating that "[t]he use of force will be progressive in nature, and may include verbal, physical force, the use of non-lethal weapons or any other means at the officer's disposal, provided they are reasonable under the circumstances." App. at 998a. Chief Zuger testified further that "[t]he policy of the Homestead Police Department is to use only the amount of force which is necessary in making an arrest or subduing an attacker. *In all cases, this will be the minimum amount of force that is necessary*." App. at 1001a (emphasis added).[10]

However, as the majority notes, the Borough provided only guns to its officers. It did not equip them with any non-lethal weapons. Rather, an officer had to request any non-lethal weapon he/she might wish to carry and the request had to be approved by Zuger. If the request was approved, the officer then had to undergo additional training with the new weapon and become certified to use it. App. at 986a-87a. Although Chief Zuger was not asked about training in lethal force, the fact that

---

[10] Indeed, a municipal policy that authorized and condoned the use of deadly force when an officer reasonably believed non-lethal force to be sufficient would certainly run afoul of the Constitution. *Cf. Canton*, 489 U.S. at 390 n.10.

officers were equipped with a gun and had to be trained in any approved non-lethal weapon they may have carried certainly supports the inference that the Borough only trained officers in the use of lethal force unless the Borough approved an individual request for a non-lethal weapon.

It is obviously foreseeable that an officer who is equipped only with a lethal weapon, and trained only in the use of lethal force, will sooner or later have to resort to lethal force in situations that officer believes could be safely handled using only non-lethal force under the Borough's own "progressive force" policy. This record therefore presents that "narrow range of circumstances, [where] the violation of federal rights [is] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409.

My colleagues state that "we have never recognized municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons." Maj. Op. at 27. I agree. However, we have never before addressed that precise issue. Accordingly, our failure reject that theory of recovery is neither relevant nor precedential. I am also far less impressed with the analysis of the Court of Appeals for the Seventh Circuit in *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) than my colleagues. As the majority notes, the court there stated:

> We do not think it is wise policy to permit every jury

in these cases to hear expert testimony that an arrestee would have been uninjured if only the police had been able to use disabling gas or a capture net or a taser (or even a larger number of police officers) and then decide that a municipality is liable because it failed to buy this equipment (or increase its police force). There can be reasonable debates about whether the Constitution also enacts a code of criminal procedure, but we think it is clear that the Constitution does not e n a c t    a    p o l i c e administrator's equipment list.

*Id.* at 1150-51 (footnote omitted) (quoted in Maj. Op. at 27-28). However, defining our inquiry in terms of whether the Constitution creates an approved "equipment list" for police is both misleading and counterproductive. That is simply not the issue, and that formulation of the issue obfuscates our inquiry rather than advancing it. Given the duties of a police officer, it was certainly foreseeable that the Borough's policy of equipping officers only with guns and training them only in the use of deadly force would sooner or later result in the use of unjustifiable deadly force.

Moreover, Chief Zuger's testimony

17

dispels the fanciful notion that a finding of liability here would potentially result in a constitutionally mandated "equipment list." He testified that an officer could seek approval for "*any*" non-lethal weapon, including mace, pepper spray, a baton, etc. 1020a (emphasis added). The result is, therefore, not a mandated equipment list, but a mandated alternative to using deadly force in those situations where an officer does not believe it is necessary to use deadly force. We must not forget that "[o]ne of the main purposes of nonlethal, temporarily incapacitating devices such as pepper spray is to give police effective options short of lethal force that can be used to take custody of an armed suspect who refuses to be lawfully arrested or detained." *Gaddis v. Redford Township*, 364 F.3d 763, 774 (6th Cir. 2004). Moreover, interpreting the Fourth Amendment as requiring municipalities to provide reasonable alternatives to the use of deadly force imposes no undue burden. In fact, here, it would do nothing more than effectuate the Borough's own announced policy of "progressive force."

My colleagues imply that the Borough can not be liable under a failure to train theory because its police officers were properly trained in the use of deadly force. The majority states: "This evidence did not establish a lack of training on the use of deadly force that amounted to a deliberate indifference, nor does it demonstrate a pattern of underlying constitutional violations that should have alerted [the Borough] to an inadequate training program." Maj. Op. at 26-27. However, plaintiff never argued that liability should be imposed on the basis of a failure to train in the use of deadly force. Rather, plaintiff argues that the Borough should be liable because its policy of requiring training only in using deadly force and equipping officers only with a lethal weapon, caused Officer Snyder to use lethal force even though he did not think it reasonable or necessary to do so.

Moreover, as I have already noted, given the duties of a police officer, it does not require a "pattern of underlying constitutional violations" to alert the Borough to the fact that its policies would cause police to unnecessarily use deadly force. Rather, as I have argued above, this record satisfies the teachings of *Brown* because plaintiffs have established that "narrow range of circumstances, [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. Thus, even without a pattern of abuse, "t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision . . . reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice." *Id.*

In *Berg*, we allowed municipal liability under § 1983 because procedures were inadequate to guard against someone being arrested as the result of an

18

erroneously issued warrant and municipal defendants "employed a design where the slip of a finger could result in wrongful arrest and imprisonment[.]" 219 F.3d at 277. Reckless indifference that causes the fatal use of excessive force must surely be as actionable as reckless indifference resulting in "the slip of a finger" that merely causes an arrest.[11]

## II.

Thus, for the reasons I have set forth above, I must respectfully dissent from the majority opinion insofar as it affirms the District Court's grant of judgment as a matter of law under Fed. R. Civ. P. 50 for the Borough. I believe plaintiff is entitled to a new trial solely against the Borough, and I would remand to the District Court for that purpose.

---

[11] I also note that in *Berg*, we did not express a concern that holding municipalities liable for arrests that resulted from nothing more than "the slip of a finger" would result in a constitutionally mandated set of procedures that municipalities would have to follow when obtaining arrest warrants.

19