**Renee WHEELER et al.**

v.

**CITY OF PHILADELPHIA et al.**

**No. Civ.A. 04–3792.**

United States District Court,
E.D. Pennsylvania.

April 21, 2005.

Louis E. Slawe, Philadelphia, PA, for
Renee Wheeler, Delores Faqua Wheeler,
Daphne Wheeler, Anthony Wheeler, Neile

Goodman, Nigel Goodman,Aaron Brown and Anna–Marie Wheeler.

Edward D. Chew, Jr., Philadelphia, PA, for City of Philadelphia, Philadelphia Police Department, Sylvester Johnson, Commissioner Phila. Police Dept., Gregory Schaffling and Michael Cannon.

### MEMORANDUM

DALZELL, District Judge.

On August 17, 2002, William Wheeler had a psychotic breakdown near his Philadelphia home. Hallucinating, high on cocaine, and armed with a pair of scissors, a steak knife, and a screwdriver, he ran into the street screaming at imaginary assailants. When police officers arrived, they tried to calm Wheeler, to no avail. Wheeler charged them with a screwdriver. The officers deployed pepper spray, grounded Wheeler, and then used control holds to handcuff him. Minutes later, he died of cardiac failure.

His family sued the City of Philadelphia, the Philadelphia Police Department, Police Commissioner Sylvester Johnson, and the two officers involved in the scuffle. We here consider defendants' motion for partial summary judgment. At this late stage, Renee Wheeler, as executrix of her brother's estate ("plaintiff"), remains as the only plaintiff. She asserts one federal claim, under 42 U.S.C. § 1983, and five state law claims against the City and the officers.

For reasons detailed below, we hold that, under the Fourth Amendment, the officers' conduct was objectively reasonable. Further, as a matter of law, we decline to apply the state-created-danger doctrine to this case of alleged excessive force.

This latter holding involves consideration of what, if any, interplay there should be between settled Fourth Amendment seizure jurisprudence and the aside of *DeShaney* that became the acorn of the state-created danger cases. We thus write at some length.

### I. *Factual and Procedural Background*

William Wheeler ("Wheeler") was a 240–pound, 6'2″ ironworker who lived in Northwest Philadelphia. Pl.'s Mem. Opp. Summ. Judg. ("Pl.'s Mem."), IAD # 02–1119 Internal Investigation Report ("Pl.'s Ex. A"), at 2.[1] He was also a cocaine addict. *Id.* at 2, 3. Late into the evening hours of August 16, 2002, Wheeler drank beer. *Id.* at 6. The next morning, he awoke at 7:00 a.m. and, an hour later, began imbibing more. *Id.* at 2. He did not take the medication prescribed for his cocaine addiction, and, upon depleting his beer supply, ventured to a nearby store to buy more. *Id.*

Arriving home, Wheeler was visibly distraught, perhaps because he had recently seen his daughter for the first time in fifteen years. *Id.* Wheeler entered his

---

1. We draw nearly all of these facts from a January 12, 2004 internal investigation report written by Sergeant Chester J. O'Neill and Commanding Officer Aaron Horne. Aside from an autopsy report, this is the sole document plaintiff submits to oppose summary judgment.

 Because, in the report, O'Neill summarizes the statements of twelve witnesses and Horne forms conclusions based upon them, the report is textbook hearsay. *See* Fed.R.Evid. 801(c); Fed.R.Evid. 802. Because plaintiff conceivably could call each declarant to testify at trial, however, we may consider it. *See, e.g., J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Comp.,* 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993); *Stelwagon Mfg. Comp. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1275 n. 17 (3d Cir.1995). We also note that, in their reply to plaintiff's brief opposing summary judgment, defendants never object to reference to the report.

home and, at some point, took cocaine. Pl.'s Mem., Office of Medical Examiner, Report of Autopsy ("Pl.'s Ex. B"). In the past, cocaine, especially when combined with alcohol, triggered seizures in Wheeler. Pl.'s Ex. A, at 2, 3.

Whether the result of seeing his daughter, drinking beer, taking cocaine, or some combination thereof, at around 3:00 p.m. Wheeler started hallucinating. He left his home and ran from porch to porch screaming that "someone was after him." *Id.* at 2. Because Wheeler wanted to protect an elderly woman from his imaginary assailants, Wheeler told his wife to call the police. *Id.*

Fearing a car would hit her husband, Delores Walker asked a neighbor and Wheeler's mother to call 911. *Id.* at 2, 3. Shortly thereafter, Wheeler produced the first of three weapons, a pair of scissors. *Id.* at 2. Seeing this, Delores Wheeler wrestled the scissors from her husband. *Id.* This prompted Wheeler to produce a second weapon, a five-inch steak knife. *Id.* at 1, 2, 6, 7. Delores Wheeler again tried to disarm her husband, but this time failed, and during the struggle suffered a gash on her finger that splattered her shirt with blood. *Id.* at 2, 6.

Around this time, two Philadelphia police officers, Gregory Schaffling and Michael Cannon, responding to a "person with a weapon" call, arrived on the scene. *Id.* at 6, 7. When the officers got out of their car, a woman with a bloody shirt, Delores Wheeler, greeted them and motioned toward the steps, where her husband sat holding the knife. *Id.* 6, 7. Appearing drunk or doped up, Wheeler yelled at the apparitions he "saw". *Id.*

Schaffling and Cannon approached. *Id.* at 2, 6. According to Delores Wheeler, they "tried to talk to him about giving up the knife, but he refused." *Id.* 2. The officers assured Wheeler he was safe and that no one was after him, but to no avail. *Id.* When Schaffling ordered Wheeler to drop the knife, he refused. *Id.* at 6. Around this time, Wheeler's mother arrived, and Delores Wheeler either grabbed the knife, *id.* at 6, 7, or her husband dropped it. *Id.* at 2.

Upon losing the knife, Wheeler pulled out his third weapon, a screwdriver. *Id.* at 2, 6, 7. He arose from the steps and yelled, louder and louder, at his "imaginary people". *Id.* at 6, 7. Foaming at the mouth, Wheeler began running around cars when, still clenching the screwdriver, he charged in the direction of Schaffling and Cannon.[2] *Id.* at 2, 6, 8. When he closed in on them, the officers deployed pepper spray. *Id.* at 2, 6, 7, 8, 9. The spray "did not take [Wheeler] off his feet." *Id.* at 7. Cannon "tripped" him, Wheeler fell, and a struggle

---

2. In summarizing Delores Wheeler's account, Sergeant O'Neill wrote only that "He [William Wheeler] continued repeating someone was after him and they were going to kill them, he then produced a screwdriver from his pants pocket. He began running around parked cars, foaming at the mouth [when] [a]n officer sprayed him with OC spray." *Id.* at 2. In other words, according to O'Neill's summary, Delores Wheeler never mentioned that Wheeler charged in the direction of Schaffling and Cannon. According to O'Neill's summary of Schaffling's account, the officers used pepper spray only when Wheeler charged them with the screwdriver. *Id.* at 6. While, in ruling on a motion for summary judgment, we must resolve all disputes in plaintiff's favor, we view Schaffling's account as supplementing, rather than disputing, Delores Wheeler's account.

Further, to deploy pepper spray, one must hit an attacker's face, and because spray is vaporous, the attacker must be close physically. Because the pepper spray indisputably hit Wheeler's face, the only reasonable inference we may draw is that Wheeler was close to the officers. In any event, even had Wheeler merely run around parked cars brandishing a screwdriver, he still immediately threatened others' safety, and our legal conclusions would apply with equal force.

ensued. *Id.* at 2, 6, 7. Wheeler fought and appeared to reach for the screwdriver. *Id.* at 6, 7. The officers used control holds, and, at one point, Schaffling hit Wheeler on the upper arm.[3] *Id.* at 6, 7. They ultimately cuffed Wheeler's hands behind his back and lay him face down, pending the arrival of backup. *Id.* at 7.

Apparently, shortly after he was handcuffed, Wheeler had a seizure. *Id.* 3, 7. Cannon called an ambulance. *Id.* at 8. After the seizure stopped, backup arrived. *Id.* at 4–6. Wheeler was breathing and conscious. *Id.* at 5. When paramedics arrived minutes later, however, Wheeler was unconscious. *Id.* at 6. The paramedics took Wheeler to the Medical College of Pennsylvania Hospital, where, at 4:40 p.m., Dr. Rudinsky pronounced him dead. Pl.'s Ex. B.

The Philadelphia Medical Examiner's report concluded the causes of Wheeler's death was "cardiac dysrhythmia" and "drug intoxication and restraint."[4] *Id.* A screen of Wheeler's urine was "positive for cocaine and opiates." *Id.*

On August 11, 2004, Wheeler's sister, Renee Wheeler, as executrix of his estate, sued the City of Philadelphia, the Philadelphia Police Department, Commissioner Sylvester Johnson and Officers Schaffling and Cannon for violating William Wheeler's civil rights. Wheeler's other family members joined in the suit. The complaint stated claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), 42 U.S.C. § 1986, and for assault, battery, false arrest, false imprisonment, and negligence.

On February 28, 2005, all defendants moved for partial summary judgment, and, since then, all plaintiffs except Renee Wheeler, on her brother's behalf, have asked us to dismiss their claims. Moreover, Renee Wheeler requests that we dismiss her Sections 1985(3) and 1986 claims, as well as all claims against the Police Department and Commissioner Johnson. Hence, only plaintiff's Section 1983 claim and state law claims against the City, Cannon, and Schaffling remain.

## II. *Legal Analysis*

Under Section 1983, Renee Wheeler advances two theories against the City, Schaffling, and Cannon, excessive force under the Fourth Amendment and state-created danger under the Fourteenth Amendment. Because the City's liability hinges on the liability of Schaffling and Cannon, we begin with plaintiff's federal claims against them.[5]

---

3. Both officers had a baton, but neither used one. *Id.* 3, 6, 7.

4. According to his wife, Wheeler had high blood pressure and heart problems. *Id.* at 2.

5. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must draw all reasonable inferences in the nonmovant's favor, *Bartnicki v. Vopper,* 200 F.3d 109, 114 (3d Cir.1999), and determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where, as here, the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if admissible, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the nonmoving party must go beyond its pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

42 U.S.C. § 1983 remedies the State's deprivation of one's constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.* In other words, rather than creating substantive rights, Section 1983 enforces them. Consequently, the initial question in a Section 1983 action is " 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Estate of Smith v. Marasco,* 318 F.3d 497, 505 (3d Cir.2003) (quoting *Donahue v. Gavin,* 280 F.3d 371, 378 (3d Cir.2002)).

### A. *Schaffling and Cannon: Fourth Amendment*

Renee Wheeler first contends that Schaffling and Cannon violated her brother's Fourth Amendment right to be free from the use of excessive force.

■ To demonstrate excessive force, a plaintiff must show that "a 'seizure' occurred and that it was unreasonable." *Id.* at 515 (quoting *Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999)). A seizure indisputably occurred. Not only did Cannon and Schaffling apply force, but they also handcuffed Wheeler. *See Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (holding seizure of person occurs if "a reasonable person would have believed that he was not free to leave"); *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (holding seizure of person requires either physical force or submission to assertion of authority). Thus, the only question is whether the seizure was reasonable.[6]

■ To measure reasonableness, a court must consider whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Smith,* 318 F.3d at 515 (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). We must adopt "the perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight" and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. While "reasonableness under the Fourth Amendment should frequently remain a question for the jury," *Abraham,* 183 F.3d at 290, " 'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.' " *Id.* (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)).

During the struggle, Cannon and Schaffling both deployed pepper spray and executed control holds. Cannon admits he tripped Wheeler, and Schaffling admits he

---

**6.** The reasonableness test of *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) rather than the immediate-danger test of *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) applies: "Just as an application of 'deadly force' may not result in death, the fact that a seizure results in death does not necessarily mean that 'deadly force' has been applied." *In re City of Philadelphia Litigation,* 49 F.3d 945, 966 (3d Cir.1995).

struck Wheeler on the upper arm. The two officers handcuffed Wheeler and placed him in a prone position pending the arrival of paramedics.

■ To determine whether the officers acted reasonably, we may consider eight factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether he actively is resisting arrest or attempting to evade arrest by flight; (4) the possibility the persons subject to the police action are themselves violent or dangerous; (5) the duration of the action; (6) whether the action takes place in the context of effecting an arrest; (7) the possibility that the suspect may be armed; and (8) the number of persons with whom the police officers must contend at one time. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (first three factors); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir.1997) (adding five more factors); *see also Smith*, 318 F.3d at 515.

While Cannon and Schaffling dealt with just one suspect, which in the abstract may be seen as tending to weigh against the use of force, all of the other *Graham* and *Sharrar* factors support it.

■ Beginning with whether Wheeler immediately threatened others' safety and was a danger, these factors strongly support the officers' actions. First, Wheeler, a 240–pound, 6′2″ ironworker, was hallucinating and obviously deranged. *See Smith*, 318 F.3d at 516–17 (finding suspect's mental instability tipped in favor of force). Second, the dispatcher ordered the officers to respond to a "person with a weapon" call, Pl.'s Ex. A, at 6, and in the officers' presence Wheeler wielded not one but *two* weapons, a steak knife and a screwdriver. *See id.* (noting that suspect's access to weapons supported use of force); *Mellott v. Heemer*, 161 F.3d 117, 123 (3d Cir.1998) (same); *Doby v. DeCrescenzo*, 171 F.3d 858, 874 (3d Cir.1999) (same).

Third, minutes earlier, Wheeler gashed his wife when she attempted to seize his knife; she "had blood on her shirt" when Officer Schaffling met her. Pl's Ex. A. *See Smith*, 318 F.3d at 517 (emphasizing that absence of evidence showing suspect used his weapons recently militated against force); *Mellott*, 161 F.3d at 123 (emphasizing suspect's recent use of pick-up truck to chase agent off property cut in favor of force). Fourth, sizable, armed, and highly erratic, Wheeler visibly had the ability to harm others. *See Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir.1995) (holding jury could find that seventy-five-year old stroke victim "did not pose a serious threat" to officer, weighing against force). Last, in addition to ability, Wheeler in fact demonstrated an intent to harm when he rushed at the officers with the screwdriver.

Turning to the severity of the crime, our Court of Appeals is more likely to find a crime severe when it is violent. *Compare Sharrar*, 128 F.3d at 822 (finding crime severe when police knew at least one of the four suspects used a gun in a violent episode two hours earlier) *with Smith*, 318 F.3d at 516 (finding crime mild when police responded to a homeowner's complaint about his neighbor and distinguishing *Sharrar* on this ground). When the officers here arrived at the scene, they faced an explosive situation. Deranged, Wheeler armed himself with two weapons. He disregarded the officers' attempts to pacify him and refused to surrender. His wife was bleeding from a knife wound when the officers met her. His crime was palpably severe.

When Wheeler charged, Cannon and Schaffling had a split-second to react. They did not have the luxury of cool deliberation on the most prudent course of action. *See Smith*, 318 F.3d at 517 (suggesting that the length of time an officer

has to deliberate inversely correlates to the amount of force that is reasonable). Furthermore, while the officers were present, Wheeler brandished two weapons. *See id.* at 516–17 (noting that suspect's access to weapons supported use of·force); *Sharrar*, 128 F.3d at 822 (highlighting that firearm a suspect earlier used to beat girlfriend was "unaccounted for" supporting force). Last, Cannon and Schaffling attempted to arrest Wheeler, who resisted by disregarding their orders, running, fighting, and even bolting toward them with a weapon. *Doby*, 171 F.3d at 874 (holding use of force was reasonable when committed patient kicked, screamed, and evaded capture).

Although never articulated in *Graham* or *Sharrar*, an additional factor supports the reasonableness of Cannon's and Schaffling's response. Their use of force was only a last resort, and, even then, involved a minimal amount. Seeing a disturbed man waving a knife, they did not so much as reach for their guns. Instead, according to Wheeler's wife, they "tried to talk to him about giving up the knife," and, upon his refusals, "continued to reassure him no one was after him, but to no avail." Pl.'s Ex. A, at 2. Only when Wheeler charged them with a screwdriver did the officers use force. And even then, rather than beating Wheeler with their batons, Cannon and Schaffling responded modestly when they used pepper spray, grounded him, and then applied control holds to affix handcuffs.

Far from excessive, the force they used was reasonable and, we should say, exemplary. Indeed, this may explain why plaintiff conspicuously fails to propose what else Cannon and Schaffling should have done.

### B. *Schaffling and Cannon: State-Created Danger*

In the alternative, plaintiff asks us to accept a novel theory of excessive force liability. She claims the officers violated Wheeler's right to substantive due process under the "state-created danger" doctrine. We begin by discussing this doctrine and then explain why, as a matter of law, it should not apply.

■ Generally, the State has no duty to protect citizens from the violent acts of private individuals. *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, a family court awarded custody of a young boy, Joshua, to his abusive father. *Id.* at 191, 109 S.Ct. 998. Despite repeated abuse complaints, the county's Department of Social Services never attempted to revoke custody. *Id.* at 192–93, 109 S.Ct. 998. Ultimately, the father beat Joshua so severely he suffered permanent brain damage. *Id.* at 193, 109 S.Ct. 998. He and his mother sued the county, department, and various employees under Section 1983 for depriving Joshua of liberty without due process of law, in violation of his substantive Fourteenth Amendment rights. *Id.* In rejecting Joshua's argument that the State breached a constitutional duty to protect him from his father, the Supreme Court explained,

[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* at 195, 109 S.Ct. 998. Thus, under *DeShaney*, our Constitution imposes no duty on state actors to protect citizens from the violent acts of private individuals.

■ Courts have developed two narrow exceptions to this rule. First, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200, 109 S.Ct. 998. In other words, by restraining one's liberty, the State renders one unable to care for himself; therefore, affirmative duties of care and protection arise.

■ Second, and relevant here, is state-created danger. When the State creates a danger that harms someone, he may hold the state actor liable for depriving him of substantive due process. Building on *De-Shaney's* aside that hinted Joshua could have held the defendants liable had they created his danger,[7] in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996), our Court of Appeals endorsed the state-created-danger doctrine, holding that a plaintiff must prove four elements: "(1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state actor

acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state actor used his authority to create an opportunity for danger that otherwise would not have existed." *Rivas v. City of Passaic*, 365 F.3d 181, 194 (3d Cir.2004) (citing *Kneipp*, 95 F.3d at 1208).

In *Kneipp*, our Court of Appeals concluded that police officers could be held liable by a woman who suffered hypothermia after they detained her and then let her walk home, alone and drunk, on a cold night. 95 F.3d at 1211. Samantha Kneipp was inebriated and walking home with her husband when the police stopped her about one-third of a block from her home. *Id.* at 1202. While the officers released Samantha's husband, they detained her somewhat longer, later sending her home alone. *Id.* On the way, she fell down an embankment and suffered severe hypothermia, causing permanent brain damage. *Id.* at 1203. Her guardians sued on her behalf, and our Court of Appeals held that "[a] jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased." *Id.* at 1209.[8]

---

**7.** The Court wrote, "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. 998.

**8.** Since *Kneipp*, our Court of Appeals has refined its requirements. Most notably, it added *County of Sacramento v. Lewis'* s holding that, in a pursuit case, a plaintiff may hold the pursuing officer liable only for conduct that "shocks the conscience," 523 U.S. 833, 845–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), into *Kneipp's* "willful disregard" element. *Estate of Smith v. Marasco*, 318 F.3d 497, 508 (3d Cir.2003).

In proving willful disregard, "The precise degree of wrongfulness required to reach the conscience-shocking level depends on the circumstances of a particular case." *Id.* The key factor is the time in which the state actor has to reflect. When the time element is instantaneous, such as a prison riot or high-speed chase, liability attaches only when the plaintiff demonstrates a "purpose to cause harm." *Id.* (quoting *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999)). In contrast, when the circumstances permit cool deliberation, such as a warden responding to a prisoner's request, "deliberate indifference" may suffice. *Id.* Between these two poles are situations that require *some* urgency. There, a plaintiff must show "a level of gross negligence or arbitrariness that indeed 'shocks the

■ Plaintiff hopes to anchor her excessive force claim on the state-created-danger doctrine. Our Court of Appeals has applied the doctrine to cases in which the police used both force and created a danger that harmed the individual. *See Smith v. Marasco,* 318 F.3d 497, 506–11 (3d Cir. 2003) (applying doctrine when disturbed man suffered fatal heart attack due to overwhelming police response—including a SWAT team and helicopter—to a neighbor's complaint); *Neuburger v. Thompson,* No. 04–1690, 2005 WL 19275, at *4 n. 1 (3d Cir. Jan.5, 2005) (applying doctrine when armed troopers rushed distraught woman alone on a jetty and grasping a handgun, despite her pleas to stay away, inducing her to aim at a trooper and draw fatal fire). Our Court of Appeals has never considered whether a plaintiff may predicate a Section 1983 claim for pure excessive force on the state-created-danger doctrine. For three reasons, we hold that, at least here, plaintiff cannot.[9]

The major reason not to apply the state-created-danger doctrine is that in *Graham* the Supreme Court wrote that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham,* 490 U.S. at 395, 109 S.Ct. 1865 (emphasis in original). The Court reasoned that, because the Fourth Amendment explicitly protects citizens from excessive force, it, "not the more generalized notion of 'substantive due process,' " must guide courts. *Id.*

Subsequent Supreme Court cases show that *Graham's* italicized "all" really means *all* in the inclusive dictionary sense. That later jurisprudence confirms that if a plaintiff's claim is "covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim *must* by analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (emphasis added); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 843–44, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding that, if respondents' claim was "covered by" the Fourth Amendment, substantive due process would not apply).

conscience.' " *Id.* (quoting *Miller,* 174 F.3d at 375–76).

9. One district court facing this issue bypassed it. In *Neuburger v. Thompson,* 305 F.Supp.2d 521, 532 n. 6 (W.D.Pa.2004), described above, the district court underscored,

> At oral argument, this Court was inclined to view the case at bar as more appropriately analyzed under the state-created danger paradigm than traditional Fourth Amendment principles, given Plaintiff's focus on the alleged unreasonableness of the on-scene officers' conduct prior to the shooting. On further reflection, it is questionable whether *Graham v. Connor* even permits consideration of a state-created danger theory in the context of this case.... For present purposes, we assume that it does.

*Id.* The district court simply assumed the doctrine applied and then found that the com-

plaint insufficiently stated a claim under it. *Id.* at 532.

Another district court let the plaintiff sue an officer for excessive force under a state-created-danger theory. *See Hutchison v. Brookshire Brothers, Inc.,* 225 F.Supp.2d 719, 723 (E.D.Tx.2002). In *Hutchison,* a police officer forced a gas-station patron to suck and siphon ten buckets of gasoline from his vehicle. The patron sued the officer under Section 1983 under both Fourth Amendment and state-created-danger theories, and the district court denied summary judgment on both. *Id.* at 726–27. The court appeared to reason that state-created danger is an exception to *Graham's* ukase that the Fourth Amendment is the exclusive "guide" for analyzing excessive force claims. *Id.* at 727.

The Fourth Amendment by its terms covers "searches and seizures," and, because Cannon and Schaffling applied force and handcuffed Wheeler, a seizure occurred. *See* U.S. Const. amend. 4; *Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Consequently, the Fourth Amendment is the *only* amendment available to support plaintiff's excessive force claim.

The practicalities of police work support our taking *Graham's "all* claims" to mean all claims. Unlike many legal tests, the Fourth Amendment reasonableness inquiry is straightforward and officers can readily apply it. The officer who could fire his gun, swing his baton, or spray his can of mace can ask himself, "What's reasonable here?" In contrast, the four-step state-created danger doctrine is complex and, as our Court of Appeals diplomatically put it, "elusive." *See Smith,* 318 F.3d at 509. Among other questions, applying the doctrine would require the officer to ask, "Am I about to use my authority to create an opportunity for harm that otherwise would not have existed?" While this difficult and probably imponderable question may be interesting to contemplate in the "peace of a judge's chambers," *Graham,* 490 U.S. at 396, 109 S.Ct. 1865, it is hopeless to expect officers to apply it amid the chaos of the streets where "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. 1865.

A final reason we take *Graham* at its italicized "all" is that expanding the state-created-danger doctrine to cases like Wheeler's may deter officers from taking risks we want them to take. *See* Note, *Policing the Police: Clarifying the Test for Holding the Government Liable Under 42 U.S.C. § 1983 and the State–Created Danger Theory,* 54 Vand. L.Rev. 165, 201 (2001). Because police officers, unlike private actors, never get rewards for taking risks, they are already averse to liability risks. Additionally, Section 1983 liability can irrevocably tarnish officers' reputations, generate litigation expenses, and spawning damages. Consequently, opening a new avenue to Section 1983 liability when the Fourth Amendment squarely addresses excessive force could deter officers from taking risks the law should encourage them to take, as this case so dramatically shows.

Even if we did permit plaintiff to proceed against Cannon and Schaffling under a state-created-danger theory, however, the claim would still fail. Under *Kneipp,* plaintiff would have to point to evidence showing that Cannon and Schaffling willfully disregarded Wheeler's safety. 95 F.3d at 1208. To demonstrate willful disregard, plaintiff would have to show their conduct "shock[ed] the conscience," *County of Sacramento v. Lewis,* 523 U.S. 833, 845–47, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), which, here, would require showing "a level of gross negligence or arbitrariness that indeed 'shocks the conscience.' " *Estate of Smith v. Marasco,* 318 F.3d 497, 508 (3d Cir.2003). Viewing the evidence in the light most favorable to plaintiff and drawing all inferences in her favor, Cannon and Schaffling reasonably responded to an explosive situation. Confronted by a delusional man armed with a screwdriver and steak knife, they repeatedly attempted to use words, not weapons, to quell him. Only when Wheeler charged them with the screwdriver did the officers use force, and even then, the amount was measured: they deployed pepper spray, grounded Wheeler, and used control holds to handcuff him.

We shall thus grant summary judgment to Cannon and Schaffling on plaintiff's Section 1983 claim.

## C. *City of Philadelphia: § 1983*

A governmental entity, like the City of Philadelphia, cannot be held liable under a theory of respondeat superior or vicarious liability. *See Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, to hold a governmental entity liable under Section 1983, the plaintiff must "identify a policy or custom of the entity that caused the constitutional violation." *A.M. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 580 (3d Cir.2004). The plaintiff must also show the "municipal policy or custom ... amounts to deliberate indifference to the rights of people with whom the police come into contact." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir.2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Last, he must demonstrate "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *Id.* (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir.2001)).

At the outset, plaintiff fails to show that Cannon or Schaffling deprived Wheeler of any constitutional rights. As explained above, neither officer violated Wheeler's Fourth Amendment right to be free from excessive force, and, as a matter of law, the state-created-danger theory does not apply. Because the police never deprived Wheeler of a constitutional right, plaintiff's *Monell* claim must fail.

■ Even if plaintiff did show a constitutional deprivation, her *Monell* claim would not survive. Plaintiff identifies no policy or custom that caused or directed the alleged deprivation of Wheeler's constitutional rights. In paragraph (f) of our March 30, 2005 Order, we ordered that by April 7, 2005 all plaintiffs should "identify any policy or custom that caused or directed the deprivation of their constitutional rights, see *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)." We entered this Order because in plaintiff's brief opposing summary judgment she never identified any policy or custom. Notwithstanding this Order, in plaintiff's supplemental brief she still fails to identify any policy or custom, thereby dispatching any *Monell* claim.[10] We shall thus grant summary judgment to the City on plaintiff's Section 1983 claim.[11]

## D. *State Law Claims*

Having disposed of plaintiff's sole federal claim, five state law claims remain. Under the supplemental jurisdiction statute, "The district court may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This decision is left to "the sound discretion of the district court," which should focus on "whether the dismissal of the pendent claims best serves the principles of judicial economy, conven-

---

10. While the internal affairs report references in a single sentence a "Force Continuum that is covered under Directive # 22," Pl.'s Ex. A, at 9, that citation falls far short of satisfying plaintiff's burden here.

11. By pointing to no municipal policy or custom, even had plaintiff shown the officers violated Wheeler's constitutional rights, she would still fail to make two other required showings: (1) proving the "municipal policy or custom ... amounts to deliberate indifference to the rights of people with whom the police come into contact," *Carswell*, 381 F.3d at 244; and (2) demonstrating "a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." *Id.*

ience, fairness, and comity." *Annulli v. Panikkar*, 200 F.3d 189, 202 (3d Cir.1999), *abrogated on other grounds, Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *see also Markowitz v. Northeast Land Co.*, 906 F.2d 100, 106 (3d Cir.1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court").

 Here, judicial economy and convenience favor plaintiff prosecuting her state law claims in state court. Although she has engaged in some discovery,[12] she can use this evidence in state court to the same extent she could here. *Annulli*, 200 F.3d at 203. As to fairness, plaintiff risked dismissal of her state law claims when she filed her lawsuit in federal court and invoked our discretionary supplemental jurisdiction power. *Id.* Last, comity favors plaintiff litigating her state law claims in state court because we will avoid guessing how Pennsylvania courts would interpret Pennsylvania law.

Original jurisdiction now lacking, we decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## III. *Conclusion*

While Wheeler's death was as sad as it was unforeseeable, Officers Cannon and Schaffling competently stabilized an explosive situation. They attempted to calm Wheeler, and applied force only upon facing his *coup de main*, even then using a minimal amount. Their actions warrant praise and not a jury trial.

For the reasons explained above, we shall grant summary judgment on all but

plaintiff's state law claims, which we shall dismiss without prejudice.

## *ORDER*

AND NOW, this 21st day of April, 2005, upon consideration of defendants' motion for partial summary judgment (docket entry # 15), plaintiffs' response (docket entry # 16), defendants' reply (docket entry # 17), plaintiff's supplemental brief (docket entry # 19), and accompanying memorandum of law, it is hereby ORDERED that:

1. The claims of all plaintiffs except Renee Wheeler, as executrix for the estate of William Wheeler (hereinafter "plaintiff"), are DISMISSED WITH PREJUDICE, *see* Pl.s' Resp. to the Order of Court Dated March 30th, 2005 ("Pl.s' Supp. Resp.") ¶ 1;

2. All of plaintiff's claims against the Philadelphia Police Department and Police Commissioner Sylvester Johnson are DISMISSED WITH PREJUDICE, *see* Pl.s' Resp. to Def.s' Mot. for Summ. Judg. ¶¶ 7, 9, 11, 14; Pl.s' Supp. Resp. ¶¶ 5.a; 5.b; 5.c.;

3. Plaintiff's claims against all defendants under 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986 are DISMISSED WITH PREJUDICE, *see* Pl.s' Supp. Resp. ¶¶ 5.d; 5.e;[1]

4. The motion for summary judgment of all remaining defendants on plaintiff's last federal claim under 42 U.S.C. § 1983, is GRANTED;

5. Because we decline to exercise supplemental jurisdiction, plaintiff's state law claims against the remaining defendants are DISMISSED WITHOUT PREJUDICE; and

---

12. Albeit very little. In opposing summary judgment, plaintiff did not submit a single deposition to us.

1. Plaintiff's apparent 42 U.S.C. § 1988 claim against all defendants, see Compl. ¶ 34, is really a 42 U.S.C. § 1983 claim. *See* Pl.s' Supp. Resp. ¶ 6.

6. The Clerk of Court shall CLOSE this case statistically.